ANDREW M. CALAMARI
REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
Tel: (212) 336- 0077 (Paul G. Gizzi, Senior Trial Counsel)
Email: GizziP@sec.gov

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| -against- | ECF CASE |
| THE LEONARD VINCENT GROUP, LEONARD VINCENT LOMBARDO, and BRIAN A. HUDLIN, | COMPLAINT |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants The Leonard Vincent Group ("TLVG"), Leonard Vincent Lombardo ("Lombardo") and Brian A. Hudlin ("Hudlin") (collectively "Defendants"), alleges as follows:

### SUMMARY

1. This case concerns an offering fraud against investors perpetrated by a Long Island-based recidivist, Leonard Vincent Lombardo ("Lombardo").

2. Lombardo, along with his alter ego, The Leonard Vincent Group ("TLVG"), managed or controlled numerous affiliated entities including: LVG Holding Company D&L 1200 LLC; LVG Holding 1255 LLC; and LVG Capital Growth Portfolio Inc. (collectively, "the

LVG Funds"); and an e-cigarette business called Clearette Cigarette Company ("Clearette").

3. Lombardo and those who worked under his direction offered and sold interests in TLVG and the LVG Funds to over 100 investors between 2011 and 2015, representing to them that their money would be used to make lucrative investments in distressed real estate and promising them unrealistically high rates of return. However, Lombardo invested only a small fraction of the investor money in real estate and used the bulk of the remaining investor money to fund Clearette, to pay prior investors, and to pay personal expenses, like his BMW and Mercedes Benz car payments, the marina fees on his boat, and visits to tanning salons. Thereafter, Lombardo used the proceeds of the LVG Funds and Clearette to start yet another company selling E-Juice (the solution used in electronic cigarettes), ultimately defrauding not only the initial investors in TLVG and the LVG Funds, but also investors who agreed to roll their investments into Clearette.

4. Lombardo was assisted in this scheme by Brian Hudlin, TLVG's CFO, who managed all the monies for the various entities, had signatory authority over the relevant bank accounts, and executed fund transfers between TLVG, the LVG Funds, Clearette, LJ Leonard and Sons and Lombardo's personal accounts without investor consent.

5. Ultimately, Lombardo raised over $7.1 million for TLVG, the LVG funds, and Clearette. Of that amount, no more than $1.5 million was invested in real estate. The remainder was extensively commingled and ended up funding other businesses, perpetuating the fraud by, among other things, paying individuals to solicit investments, or being used for Lombardo's personal expenses. Due to this fraudulent scheme, almost every investor has lost his entire investment.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

6. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)].

7. The Commission seeks a final judgment permanently restraining and enjoining Defendants from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder; ordering TLVG and Lombardo to disgorge their ill-gotten gains together with prejudgment interest thereon; and ordering Hudlin to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)], and Sections 21(d), (e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Eastern District of New York and were effected, directly or indirectly, by making the use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. For example, TLVG was headquartered in, and Lombardo and Hudlin resided in, the Eastern District of New York during the relevant time period of conduct described herein.

## DEFENDANTS

10.     **TLVG** is a private Delaware corporation based in Ronkonkoma, NY that was formed no later than July 2011. TLVG owns and operates numerous limited liability companies and other entities that purportedly invest in distressed real estate, such as the LVG Funds, provide unspecified consulting services, and operate companies that sell e-cigarette, or "vaping," products. Additionally, TLVG raised roughly $1.1 million dollars directly from investors which it later placed into its various investment fund accounts. Lombardo's wife is identified as the owner or general partner of TLVG in various documents, and Hudlin is identified as its CEO. However, Lombardo was in fact controlling TLVG, and Hudlin was in charge of the company's finances.

11.     **Lombardo,** 42, created and controlled TLVG, and was a signatory of several of its bank and securities accounts. In the 1990's, Lombardo held Series 7 and 63 brokerage licenses and was associated with at least four registered broker-dealers, including Stratton Oakmont Inc. and William Scott & Co., LLC. On June 5, 2001, the National Associate of Securities Dealers ("NASD") found that Lombardo made material misrepresentations to his customers about the price and performance of various risky stocks while employed at a broker-dealer and engaged in unauthorized transactions in his customers' accounts, ultimately causing tens of thousands of dollars in losses to his customers. NASD subsequently barred him from associating with any NASD member. Presently, Lombardo holds himself out as a consultant for LJ Leonard & Sons, which purports to be a consulting service for retailers and marketers, but it has never earned any revenues from consulting services and ultimately became a manufacturer of vaping products. He also purports to run a smoking cessation charity and a leukemia charity. The United States Attorney's Office for the Eastern District of New York filed an Information in

4

*United States v. Leonard Vincent Lombardo*, Crim No. 17 CR 318 (JA) (E.D.N.Y) (the "Criminal Proceeding") and Lombardo pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 on June 22, 2017.

12.     **Hudlin**, 63, is the de facto chief financial officer and controller of TLVG. He is identified in press releases as the CEO of TLVG but did not act in that capacity; rather, he acted as CFO and controller, and had signatory access to all bank accounts. Hudlin executed numerous transactions between many TLVG related accounts that did not have any economic purpose and assisted in the use of investor funds to pay Lombardo's personal expenses.

## OTHER RELEVANT ENTITIES

13.     **LVG Holding Company D&L 1200 LLC** is a Delaware limited liability corporation that offered "units" in the company to investors. The offering documents and representations made by Lombardo and other TLVG officials stated that investor money would be used to buy distressed real estate. Ultimately, much of the over $3.1 million raised by this entity was either misappropriated or used to fund other businesses.

14.     **LVG Holding 1255 LLC** is a Delaware limited liability corporation that offered "units" in the company to investors. The offering documents and representations made by Lombardo and other TLVG officials stated that investor money would be used to buy distressed real estate. Ultimately, much of the over $1.6 million raised by this entity was either misappropriated or used to fund other businesses.

15.     **LVG Capital Growth Portfolio Inc.** is a Delaware limited liability corporation that offered shares in the company to investors. The offering documents and representations made by Lombardo and other TLVG officials stated that investor money would be used to buy distressed real estate. Ultimately, much of the over $576,000 raised by this entity was either

5

misappropriated or used to fund other businesses.

16.     **Clearette** is a Delaware limited liability company started by Lombardo and TLVG to distribute e-cigarette products. Clearette offered "membership units" to investors. It raised approximately $686,000 from investors directly and received at least $2 million in funds from investors in other LVG Funds.

17.     **LJ Leonard and Sons** is a Delaware limited liability corporation. It began as a purported retail consultancy, but it ultimately became a company that manufactures and sells e-juice for vaping products. Investor funds that were not spent by Lombardo on personal expenses or other failed ventures such as Clearette were ultimately used to start this operation.

## FACTS

### I.  Lombardo Used TLVG to Perpetrate Several Fraudulent Offerings.

18.     Beginning around July 2011 and continuing through at least August 2015, Lombardo, working through TLVG, raised money from investors directly or via the LVG Funds. In exchange for their investments, investors received "units" or shares in one of the LVG Funds. Investors were led to believe that these investments were to be pooled with money from other investors and used by TLVG to make investments in distressed real estate pursuant to the strategies laid out in the LVG Funds' Private Placement Memoranda (PPMs). Investors expected to share in the profits of the LVG Funds, and later Clearette, and expected TLVG and Lombardo to manage the funds responsibly.

19.     The LVG Funds were purportedly designed to buy distressed real estate, improve the properties, and then rent or sell the properties for profit. Neither Lombardo nor TLVG were registered in any capacity with the Commission; nor were the LVG Funds.

20.     TLVG, through a salesforce of contractors, cold-called potential investors whose

names were predominantly gathered from purchased "lead sheets." Several salespeople hired by TLVG were previously associated with registered broker-dealers on Long Island. These former registered representatives also called their previous customers. Utilizing high-pressure sales tactics, the salespeople encouraged predominantly elderly individuals to provide the LVG Funds with money purportedly to purchase distressed properties. In total, TLVG and the LVG Funds raised over $6.5 million for these purported real estate investments. In fact, at most, only $1.5 million of these funds actually went toward purchasing or renovating properties.

21. In or around 2014, Lombardo changed TLVG's strategy. Instead of focusing on real estate investments, Lombardo or individuals acting on his instructions began soliciting both existing investors and new investors for Clearette. At Lombardo's instruction, moneys were also transferred from the LVG Funds to Clearette.

22. The majority of fund transfers into Clearette from the LVG Funds, many if not all of which were executed by Hudlin, were not authorized by investors. In some cases, however, Lombardo was able to convince existing investors to invest directly in Clearette or convince investors to exchange their LVG Fund investments for an investment in Clearette. He did this, in part, by telling these investors that the returns to date had been very strong and that investors would make even more money with the Clearette investment. These statements regarding the LVG Funds' investment performance were false.

23. Unbeknownst to those investors, at the time Lombardo sought to convince them to exchange their LVG Fund investments for Clearette, Lombardo, with Hudlin's assistance, had in many cases already transferred their investments to Clearette.

24. For example, Investor A invested a total of approximately $300,000 in the LVG Funds beginning on October 5, 2012 and ending on April 26, 2013. Sometime in late 2014 or

early 2015, Lombardo contacted Investor A directly and offered him an opportunity to convert his investment in the LVG Funds into an investment in Clearette. Lombardo told Investor A that his initial $300,000 investment in the LVG Funds was now worth $423,000. This was false as the LVG Funds never appreciated in value. Further, Lombardo told Investor A that by converting his LVG Fund investment into Clearette, he would receive another 20% return by receiving additional "membership units" in Clearette. Lombardo also convinced Investor A to invest an additional $100,000 in Clearette itself, in addition to the transferred funds. In total, Lombardo represented to Investor A that his various investments were now worth over $600,000 dollars. This was false since there was no basis for these lofty valuations of either the LVG Funds or Clearette. Furthermore, only approximately $50,000 was transferred to Clearette the two months following Investor A's agreement to transfer funds.

25. In or around 2015, Lombardo changed TLVG's strategy yet again. He shuttered the Clearette electronic cigarette business and transferred the funds held by Clearette into another business, LJ Leonard and Sons. This business made "E-Juice", *i.e.*, liquid used in vaping products. This business was a distinct legal entity from Clearette and the transfer of funds from Clearette into this new business was never disclosed to investors.

## II. TLVG's and Lombardo's Misuse of Investor Funds and Misrepresentations to Investors and Potential Investors.

26. Lombardo, as aided by Hudlin, routinely misused investor funds for purposes other than what the investors were promised. For example, over $1 million in investor funds were transferred to Clearette without permission and in some cases despite express instructions to the contrary.

27. Investor funds were also used to pay investor refunds or returns. These Ponzi-like payments were clearly inconsistent with the disclosures made in the various fund offering

8

documents about how the money raised was to be used. As an example, the PPM for LVG Holding D&L 1200 LLC dated May 1, 2012 noted that of the investment proceeds collected by LVG Holding D&L 1200 LLC, 70% would be used for real estate acquisition, 20% would be used to purchase securities, and 10% would be used for other unnamed private equity investments. Nowhere did it say invested money would be directly used to pay back previous investors or make interest payments to previous investors.

28. For example, on May 8, 2014, Investor B invested $300,000 in one of the LVG Fund accounts that had an opening balance of $134.50. The next day, Lombardo and Hudlin transferred $298,000 of that money to a Clearette account, despite express instructions from Investor B that his money was not to be used to fund Clearette. Those funds were ultimately funneled through at least two other accounts controlled by Lombardo and, besides being used to fund the Clearette cigarette business, money was also used to pay Lombardo's personal expenses, to make over $10,000 dollars of dividend payments back to the investor himself, and to refund another investor over $26,000 for his investment.

29. In total, only $1.5 million of the roughly $6.5 million (*i.e., approximately only* 23%) that TLVG and the LVG Funds raised was invested in real estate despite the fact that the PPMs provided to investors stated that either 40% or 70% of investor funds raised would be invested in real estate. Ultimately, that real estate did not remain under Lombardo's control and appears to have been sold by Lombardo in order to finance his electronic cigarette ventures. The proceeds from any real estate sales and the remaining investor funds (that were not used by Lombardo for personal expenses) were used to fund other businesses, in contravention of representations made to investors.

30. Investors were also given PPMs, or in the case of Clearette operational

9

agreements, for the LLCs or companies in which they invested. These documents all contain materially misleading and false statements. Most significantly, every PPM description of how funds were to be used was inaccurate in material respects. For one, neither the PPMs for the LVG Funds, of which there are numerous versions, nor the Clearette operational agreements makes reference to LJ Leonard and Sons, the entity which was the ultimate destination for some of the invested funds. Instead, like in a LVG Holding 1255 LLC PPM dated May 1, 2012, investors were told that funds would be used for "intelligent Real Estate investment."

31. Additionally, the PPMs for LVG Holding Company D&L 1200 LLC, dated June 20, 2012, and LVG Holding 1255 LLC, dated May 1, 2012, state that 70% of the proceeds were to be used for real estate and another 20% were to be used for securities purchases. In total, roughly $4.7 million was invested into these two entities and roughly $1.5 million was invested in real estate, or 32%. While some funds were initially used for securities, those securities were ultimately sold and neither of these entities holds any securities presently.

32. Further, the PPM for LVG Capital Growth, Inc., dated April 23, 2012, claimed that at least 40% of the over $570,000 raised for that entity would be used for real estate. In fact, no properties have been purchased with those funds.

33. Notably, the PPMs for the same entity vary materially at different periods of time. For example, a November 2012 PPM for LVG Holding Company D&L 1200 LLC stated that management's compensation for the first year would not exceed $240,000. The May 2013 version, however, stated that compensation "may not exceed $425,000" for management without reference to any time period.

34. The PPMS for the LVG Funds state that TLVG salespersons could receive a commission of 10% per shares sold of each investment. This commission was not accurately

10

recorded on TLVG's books or paid to Lombardo's sales staff on a regular basis. Instead, any money that arguably could have been a commission, plus at least $500,000 more, was misappropriated by Lombardo.

35. The PPMs for the LVG Funds and the operational agreement for Clearette often reference TLVG employees and contractors with non-management jobs as being managers of the company. For example, some of the PPMs for LVG Holding Company D&L 1200 LLC reference low-level employees who drove trucks or cold-called potential investors as property managers or real estate experts. Additionally, the Clearette operational agreement listed low level employees who built e-cigarette displays as senior officers of the company. These were all materially false representations.

36. TLVG sales staff, including Lombardo or those acting at Lombardo's direction or reading from scripts or talking points provided by Lombardo, also repeatedly made oral, material misrepresentations, or omitted material facts, to TLVG investors and prospective investors while selling interests in the LVG Funds or Clearette.

37. For example, acting at Lombardo's direction, a TLVG salesperson contacted Investor B, an 88 year old retiree, on or around October 2012. The salesperson told Investor B that he was a "fund manager," although he was merely a salesperson, and that he was offering interests in a REIT that would purchase, renovate, and sell residential properties. In reality, the salesperson knew that the LVG Funds were not REITs and that Lombardo and others were already beginning operations on the separate Clearette business at that time. On October 26, 2012, Investor B invested $2,500 in the LVG Funds. By February 2013, the TLVG salesperson called Investor B and told him his initial $2,500 investment had appreciated by $1,250 or, in other words, by 50%. This statement was untrue since no LVG Fund ever appreciated and the

11

salesperson had no basis to believe that statement to be true and had never even seen any of the financials for the LVG Funds.

38. Due to the misrepresentations made by the TLVG salesperson to Investor B about his investments performance, Investor B was induced to invest a total of over $1 million in the LVG Funds by May 2014. Additionally, Investor B gave Lombardo discretion over another $300,000 in an IRA account to invest in stocks. That $300,000 was instead invested in the LVG Funds and Clearette.

39. Beginning shortly after Investor B invested with the LVG Funds, the TLVG salesperson and Lombardo himself repeatedly asked Investor B if he was interested in transferring his funds to Clearette. Investor B refused and expressly stated he did not want to invest in any business related to the cigarette industry. Despite this refusal, as noted above, Investor B's money was used, sometimes immediately, to fund the Clearette business.

40. Two different TLVG salespersons, acting at Lombardo's direction, first contacted Investor C in late 2012. They told Investor C that a partner at his company had previously invested with TLVG to persuade Investor C that TLVG was a reputable enterprise. This statement was false. They further told Investor C that his money would be used to invest in distressed real estate and that the property that the LVG Funds had purchased to date had already appreciated by 30%. There is no evidence that any property purchased by an LVG Fund ever appreciated in value. Investor C was also told that the investment was guaranteed to return 30% after just three years. Finally, Investor C was told that Lombardo had over 20 years of experience in real estate investing. Lombardo did not, in fact, have a track record as a real-estate investor. Due to these misrepresentations, Investor C ultimately invested $83,000 with the LVG Funds, all of which appears to have been spent by Lombardo or used to fund Clearette, an

investment explicitly offered to Investor C which Investor C rejected.

41. Lombardo, or individuals acting on his instructions, made similar statements to several other investors. Additionally, no TLVG representatives informed investors: (1) that investor funds intended for real estate investment would be used for other purposes, like Clearette, without the investors' consent; (2) that investor funds intended for the LVG Funds or Clearette would be used to fund LJ Leonard and Sons; and (3) that investor funds intended for real estate investment would be used to pay Lombardo's personal expenses.

### III. TLVG and Lombardo's Scheme to Defraud Investors.

#### A. Lombardo's Use of Investor Funds for Personal Expenses.

42. Lombardo or his wife used at least $1.3 million of the money raised for TLVG, the LVG Funds, or Clearette for their personal expenses. Hudlin was aware that this money was being misappropriated and he facilitated its transfer. These expenses, which were often paid for directly out of various business accounts, were not authorized by investors nor approved in the various PPMs provided to investors. In fact, PPMs provided to investors typically did not mention Lombardo by name nor refer to him receiving any compensation whatsoever. These expenses included:

    a.    $281,000 in rent for Lombardo's personal residence;

    b.    $75,000 in BMW payments and $70,000 in Mercedes Benz payments;

    c.    $50,000 in restaurant payments and $35,000 in supermarket payments;

    d.    $37,000 in payments at department stores such as Bloomingdales;

    e.    $30,000 in payments at other clothing stores;

    f.    $30,000 in payments for hotels and resorts;

    g.    $29,000 in payments for medical care;

      h.    $20,000 in payments to a pharmacy and health stores;

      i.    $19,000 in student loan payments;

      j.    $19,000 in payments to a marina and boat supply store;

      k.    $10,000 in children's toys and clothes;

      l.    $5,500 in tanning and beauty salons;

      m.    $4,000 in jewelry; and

      n.    $2,100 in pet services.

43. Lombardo's wife also received roughly $114,000 in alleged compensation from TLVG and Clearette despite never working at any TLVG entity. Furthermore, these payments were not paid out as salary; rather, they were paid out of business accounts directly and there was no tax withholding on these payments.

**B.    Commingling of Funds Among the LVG Funds, Clearette, LJ Leonard and Sons, and Lombardo Family Personal Accounts.**

44. Lombardo or Hudlin disguised their misconduct by continually transferring investor funds in and out of multiple bank accounts controlled by Lombardo and associated with several different entities.

45. There was no legitimate business purpose for this commingling and transferring; instead, money was transferred on demand to pay various undisclosed personal or business expenses, and to pay investors returns.

46. This commingling occurred over thousands of transactions beginning as early as the Summer of 2011 and continuing through at least 2015 and included all of the accounts for the LVG Funds, Clearette, and LJ Leonard and Sons as well as Lombardo's wife's personal accounts.

### C. Concealment of the Scheme.

47. At numerous points, TLVG, Lombardo, and Hudlin took actions to conceal their fraudulent scheme from investors. In addition to using investor funds to pay off other investors, Lombardo repeatedly lied to investors about the value of their investments and the timeline for when they would receive a return on their investment.

48. For example, Investor D emailed Lombardo on July 9, 2015 concerning the redemption of units as Investor D needed the money to help finance an operation for his wife. Instead of redeeming Investor D's money, Lombardo said he had been unable to meet with the managing members and that redemption "is not typical premature of winding down the company's real estate assets . . . ." At this time, the LVG Funds were already no longer in the real estate business; instead, the focus of Lombardo's efforts was his e-cigarette businesses. Additionally, only Lombardo, and no other members, managed the LVG Funds. Consequently, the statements in this email to Investor D were untrue. After several months of emailing, Lombardo did finally redeem Investor D's original investment, without appreciation, in a non-pro-rata fashion. Other investors, who similarly inquired about the status of their investments, asked for redemptions, or, in the case of Investor B, signed an agreement to be repaid their funds, were never made whole.

49. Lombardo and Hudlin also transferred the money among numerous accounts in an effort to conceal Lombardo's theft of funds and to make it more difficult for creditors and others to attach assets. Lombardo and Hudlin made thousands of transfers that had no economic purpose. At times, some of these transfers, as well as personal payments to Lombardo and his wife, were documented as "loans" on TLVG's books, but they were not in fact loans and no repayments were made.

## CLAIMS FOR RELIEF

### CLAIM I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder
### (Against TLVG and Lombardo)

50. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 49, as if fully set forth herein.

51. By engaging in the conduct described above, TLVG and Lombardo have, directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mail: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material fact(s) necessary to make statements made not misleading in light of the circumstances under which they were made; and/or (c) engaged in transactions, acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

52. By reason of the foregoing, TLVG and Lombardo, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder.

### CLAIM II
### Violations of Section 17(a) of the Securities Act
### (Against TLVG and Lombardo)

53. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 52, as if fully set forth herein.

54. TLVG and Lombardo, with scienter, by use of the means and instrumentalities of interstate commerce or of the mails, in the offer or sale of securities:

    a.    Employed devices, schemes, or artifices to defraud;

   b. Obtained money or property by means of any untrue statement of a material fact or any omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or;

   c. Engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchase.

55. By reason of the foregoing, TLVG and Lombardo, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## CLAIM III
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**(Against Hudlin)**

56. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 55, as if fully set forth herein.

57. Hudlin, directly or indirectly, knowingly or recklessly provided substantial assistance to TLVG and Lombardo who directly or indirectly and singly or in concert, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the mail: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material fact(s) necessary to make statements made not misleading in light of the circumstances under which they were made; and/or (c) engaged in transactions, acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

17

58.  By reason of the foregoing, Hudlin aided and abetted, and unless enjoined, will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

## CLAIM IV
### Aiding and Abetting **Violations of Section 17(a) of the Securities Act**
### (Against Hudlin)

59.  The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 58, as if fully set forth herein.

60.  Hudlin, directly or indirectly, knowingly or recklessly provided substantial assistance to TLVG and Lombardo, who by use of the means and instrumentalities of interstate commerce or of the mails, in the offer or sale of securities:

   a. Employed devices, schemes, or artifices to defraud;

   b. Obtained money or property by means of any untrue statement of a material fact or any omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or;

   c. Engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchase.

61.  By reason of the foregoing, Hudlin aided and abetted, and unless enjoined, will again aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5 [17 C.F.R. §§ 240.10b-5] thereunder.

### II.

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating 17(a) of the Securities Act [15 U.S.C §§ 77q(a)].

### III.

Ordering TLVG and Lombardo to pay disgorgement along with prejudgment interest thereon.

### IV.

Ordering Hudlin to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

V.

Granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
September 29, 2017

BY: _____
Andrew M. Calamari
SECURITIES AND EXCHANGE COMMISSION
Regional Director
Paul G. Gizzi, Senior Trial Counsel
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0077 (Gizzi)
Email: GizziP@sec.gov

Of Counsel:
Lara S. Mehraban
Sheldon L. Pollock
Prashant Yerramalli[*]

---

[*] Not admitted to the District Court for the Eastern District of New York